## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Bonnie Henry,

                    Plaintiff,

        vs.                                    REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

                    Defendant.          Civ. No. 04-1423 (ADM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's

final decision, which denied her application for Disability Insurance Benefits ("DIB").

The matter is now before the Court upon the parties' cross-Motions for Summary

Judgment.[1]  For these purposes, the Plaintiff has appeared pro se, and the Defendant

has appeared by Lonnie F. Bryan, Assistant United States Attorney.  For reasons

---

[1]We indulgently construe the Plaintiff's brief to the Court, see Docket No. 16, as her Motion for Summary Judgment, even though it is not expressly labeled as such.

which follow, we recommend that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

## II.  Procedural History

The Plaintiff protectively filed an application for DIB on July 18, 2001, in which she alleged that she had become disabled on February 8, 1998, when she was in a motor vehicle accident.  [T. 54-57, 353].  Her claims were denied upon initial review, and upon reconsideration.  [T. 29-30, 34-38, 41-45].

On February 26, 2002, the Plaintiff requested a Hearing before an Administrative Law Judge ("ALJ") and, on November 7, 2002, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by legal counsel.  [T. 347-88].  Thereafter, on January 29, 2003, the ALJ issued a decision which denied her claim for benefits. [T. 21-28].  The Plaintiff requested an Administrative Review before the Appeals Council which, on October 23, 2003, declined to review the matter further, for a second time, after considering additional evidence.  [T. 8-11, 13-15].  Thus, the ALJ's determination became the final decision of the Commissioner.  Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §1481.  This action was commenced on March 30, 2004.

## III.  Administrative Record

A.    <u>Factual Background</u>.[2]  At the time of the Hearing, the Plaintiff was forty-seven (47) years old, and had received her GED.  [T. 144].  The Plaintiff had prior work experience as a personal care attendant, and as a program counselor.  <u>Id.</u>  As related by the Plaintiff, she stopped working on February 8, 1998, but resumed working in June of 1998.  [T. 100].  The Plaintiff alleges that her ability to work is limited by complications following her car accident, which affected her hips, back, knees, and shoulders.  <u>Id.</u>

The Plaintiff was treated in the Emergency Room, after her motor vehicle accident, on February 8, 1998, at which time an x-ray of her cervical spine was normal.  [T. 283].  At the recommendation of Dr. Joel Wulff ("Wulff"), who is the Plaintiff's chiropractor, she was seen by Dr. Michael Bromer, for a neurological evaluation and, at that initial meeting, the Plaintiff reported a couple of previous accidents, after which she experienced intermittent low back pain, particularly when she engaged in heavy lifting, or when she was under a lot of stress.  [T. 241].  Following the most recent accident, the Plaintiff reported soreness in her hips, knees, and neck, and popping, and

---

[2]Since the ALJ found that the Plaintiff had performed substantial gainful activity ("SGA"), after her alleged onset date, he did not proceed to consider her medical history.  As a result, we only include a brief recitation of those records, in order to provide background information.

pain, in her back.  Id.  However, the Plaintiff was primarily being seen by Dr. Bromer for complaints of headaches, unsteadiness, irritability, and forgetfulness.  Id.  Dr. Bromer opined that the Plaintiff had symptoms of a post-concussion syndrome, and he ordered a CT of her head, as well as an electroencephalogram ("EEG").  [T. 244]. The CT results were normal, and the EEG was minimally abnormal, with some slowing noted in the right posterior quadrant, as well as some paroxysmal activity in the central regions, suggestive of mild cerebral dysfunction.  [T. 239-40].  As a result, the Plaintiff was diagnosed with post concussive syndrome, post traumatic cervical and thoracic musculoligamentous strain/sprain syndrome, and bilateral hip, and left knee pain.  [T. 238].

Those conditions continued and, at the end of March of 1998, it was recommended that the Plaintiff obtain a special prescription for glasses, in order to decrease some of the effects on her vision and coordination.  [T. 234].  She also reported some "shaking episodes," in April of 1998, but no further diagnostic testing was recommended at that time.  [T. 223-33].  On May 26, 1998, the Plaintiff stated that she had experienced significant improvement in her neck and low back pain, but that she still had tail bone, and bilateral hip pain, which was accompanied by intermittent numbness down the lateral aspect of her left leg.  [T. 219].  She also reported that she

had not had any more shaking episodes.  Id.  By that time, Dr. Wulff had released the Plaintiff for light duty, but she had not yet returned to her job.  [T. 220].  In June of 1998, the Plaintiff reported having daily headaches, and persistent posterior neck pain, but her range of motion had improved, and she had a reduction in the intensity of her pain.  [T. 217].  It was further noted that she had been faithfully completing her exercise program.  Id.

In August of 1998, the Plaintiff had a follow-up appointment with Dr. Bromer. [T. 215-16].  Dr. Bromer noted that the Plaintiff had been working almost eight (8) hours per day, at two different jobs -- namely, one involving home care, and the other at a group home.  [T. 215].  Although she reported pain in the same areas as she had before, Dr. Bromer noted that she had normal range of motion in her neck, and no tenderness, or spasm, in her neck and upper back.  Id.  During that same month, the Plaintiff was also examined by Dr. Robert A. Wengler, at the Orthopedics Clinic.  [T. 276].  Dr. Wengler did not see any bony abnormalities, and he opined that her symptoms would be self-limiting, and that she did not need any orthopedic attention, at that time.  Id.

On October 6, 1998, a Functional Capacity Evaluation ("FCE") was completed at Dr. Wulff's request.  [T. 317-29]. Lori Petterson ("Petterson"), who conducted the

evaluation, reported that the Plaintiff's test results suggested a valid representation of her physical capabilities. [T. 317]. However, when she was reintroduced to proper body mechanics, for various positions and activities, the Plaintiff chose not to follow the recommendations. [T. 320]. Petterson noted that the Plaintiff was very cooperative, and gave a fair effort, but that she was severely deconditioned. [T. 321]. Based upon the results of the FCE, Petterson opined that the Plaintiff could return to work at the medium physical demand level, as long as she was allowed to take breaks from sitting, standing, and walking. Id. Additionally, Petterson recommended that the Plaintiff avoid total squats occasionally, that she should carry no more than fifteen (15) pounds, when climbing stairs, and no more than five (5) pounds, when descending stairs, and that she should avoid crawling, kneeling, and crouching. Id.

The Plaintiff complained of difficulty hearing, in October of 1998, but testing revealed normal hearing bilaterally. [T. 274-75]. As for the pain, and shaking spells, the Plaintiff reported that they were much improved by November of 1998, and Dr. Bromer opined that the Plaintiff needed to work on her conditioning, and strength, before she would be able to return to work, on a full-time basis. [T. 209-12].

No interval change was noted, until at least June of 1999, when the Plaintiff reported problems with memory loss, difficulty concentrating, and clumsiness. [T.

- 6 -

202].  Since the Plaintiff had continued to complain of persistent neck and low back pain, as well as headaches, an MRI, and a pelvic x-ray, were ordered to determine whether there were any underlying structural problems.  [T. 203].  The results of those examinations revealed marked degenerative disc disease at the L5-S1 level.  [T. 200-01, 204].  Her conditions remained essentially the same in the following months and, in November of 1999, it was noted that the Plaintiff was working three (3) days per week, at a board and care facility, with lifting restrictions of forty (40) pounds.  [T. 189].

In July of 2000, the Plaintiff reported that she had been able to go up to six (6) weeks without chiropractic care, and that she was taking pain medication less than once per week.  [T. 178].  At that time, the Plaintiff also complained of an incident, in which her jaw had spontaneously snapped shut, causing her to bite her tongue and, approximately one year later, she returned for treatment of that complaint, due to an increase in frequency, of about once every two weeks.  [T. 176].  Her physician was concerned about the possibility that the Plaintiff might be having seizures, and ordered a repeat EEG, which did not reveal any abnormalities, and an MRI of the brain.  [T. 160, 172, 176].  In October of 2001, the Plaintiff was diagnosed with empty sella syndrome, and anemia.  [T. 160, 174, 253-60].  In the same month, the Plaintiff visited

the Interventional Pain Center, where the physician diagnosed her with degenerative disc disease of the lumbar spine, with narrowing of the neuroforamina at the L5-S1 level, and possible impingement of the exiting L5 nerve roots.  [T. 155-59].   The physician recommended that the Plaintiff have a lumbar epidural steroid injection for therapeutic, and diagnostic benefit, to which she agreed.  Id.  Another injection was administered in December of 2001.  [T. 286-87].

The Plaintiff's complaints remained consistent and, on October 2, 2002, she was referred for a neuropsychological evaluation.   [T. 161-65].   After being administered a battery of tests, Dr. Greg J. Lamberty, who is a clinical neuropsychologist, opined that the Plaintiff demonstrated high average abilities across a range of intellectual functioning, and neuropsychological function measures, and that her performance on tests requiring complex attention, and executive functioning, were quite strong.  [T. 164].   Although there was mild weakness for associative verbal fluency and memory for a complex visual design, there was little in the way of converging evidence of focal or diffuse cognitive impairments.   [T. 164-65].   In addition, Dr. Lamberty noted an indication of general somatization and conversion behavior, and he opined that she was doing reasonably well from a cognitive standpoint.  [T. 165].  Dr. Lamberty recommended that she obtain some individual

psychotherapy, which would be aimed at helping her to manage her physical and pain-related concerns more effectively.  Id.

Also of note, the Plaintiff's medical records contain a psychological evaluation, which was performed by Michael A. Appleman ("Appleman"), who is a licensed psychologist, in March of 1998.  [T. 312-16].  Appleman conducted a series of tests, and concluded that the Plaintiff's results were consistent with a traumatic brain injury. Id.  He diagnosed the Plaintiff with adjustment reaction, with depressed mood, posttraumatic stress disorder, and rule-out traumatic brain injury, and he recommended that the Plaintiff undergo outpatient psychotherapy.  [T. 316].  From the Record, it appears that the Plaintiff underwent therapy, with Appleman, until at least June of 1998, on an average of about once per week.  [T. 295-311].

Further, the Record contains a Work Questionnaire, which was completed by Kevin O'Donnell ("O'Donnell"), in February of 2002.  [T. 128-30].  O'Donnell stated that the Plaintiff worked an overnight shift three (3) to four (4) nights per week, during which she slept part of the time, and then, in the morning, she helped with breakfast, passed out medications, and performed some light cleaning.  [T. 128].  In response to a question as to whether he considered the Plaintiff's work to be fully worth the amount paid, O'Donnell selected the "yes" response, even though he later noted that

he had given her fewer, or easier duties, extra help, more rest periods, less hours, and irregular hours.  [T. 128-29].  As O'Donnell explained, the Plaintiff took care of the medications, and documentation, while a coworker might carry laundry, and do lifting, she needed to take breaks, and he needed to fill some of her shifts, with employees working overtime, when she missed work.  [T. 129].  However, O'Donnell reported that the Plaintiff was not frequently absent from work and, although she missed some shifts, she helped to make sure that they were covered.  Id.  Finally, O'Donnell stated that the Plaintiff's work was satisfactory and, to compensate for her lifting restriction, she was "expected to pick up more of the tasks she [wa]s capable of doing so that she [wa]s a productive member of the team."  [T. 130].          B.     Hearing Testimony.

The Hearing on November 7, 2002, commenced with some opening remarks from the ALJ, in which he noted that the Plaintiff's claim had been denied because she had returned to work, on a full-time basis, and that she was earning more than what was necessary to constitute substantial gainful activity ("SGA").  [T. 349-51].  As a result, the ALJ stated that the only matter at issue, for the purposes of the Hearing, was to determine whether the Plaintiff was earning an income that qualified as SGA, and not whether the Plaintiff met the criteria for a medical disability.  [T. 351].

The Plaintiff was born on October 10, 1955, which made her forty-seven (47) years old, on the date of the Hearing. [T. 352]. The Plaintiff lived in an apartment and, although she used to reside with her husband, she related that they had since separated. [T. 353]. The Plaintiff testified that she had become disabled on February 8, 1998, when she was in a car accident, for which she had a lawsuit pending. Id. Immediately after the accident, the Plaintiff stopped working, but she returned to work in June of 1998, with a different employer. [T. 354]. Prior to her accident, the Plaintiff was working on a full-time basis as a personal care attendant, and afterward, she did not work full-time, but she could not recall how many hours she was working. [T. 354-55]. The Plaintiff explained that she had called her previous employer, in order to see whether she could perform any light duty work and, although she was put in contact with one client, she only watched that individual for two days, because the client then entered a nursing home. [T. 355]. When her employer could not find any additional work, the Plaintiff was terminated. Id. The Plaintiff could not recall when her termination occurred, but she stated that there was a period of three (3) months, during which her employer could not find her any work. [T. 356].

The Plaintiff chose not to file for unemployment compensation. [T. 356]. Instead, the Plaintiff learned about a light-duty job with Dungarvin in Minnesota,

Incorporated ("Dungarvin"), from her niece, and she applied for that position, while she was still legally employed by Health East Optional Care.   Id.   The Plaintiff continued to work at Dungarvin at the time of the Hearing, for which she was working seventy (70) hours, every two weeks, and earning $10.95 per hour.   [T. 357]. Although she could not recall how many hours she was working at Dungarvin, when she first began her job there, the Plaintiff agreed that the following earnings, as related by the ALJ, sounded correct:  1) over $7,000.00 in 1998; 2) almost $10,000.00 in 1999; 3) over $17,000.00 in 2000; and 4) almost $18,000.00 in 2001.  [T. 358-59].

The Plaintiff related that a coworker had complained to her boss that the Plaintiff was not doing her share of the work, because she was always in pain, and when another group home opened, in October of 1998, or 1999,[3] she was offered an overnight position, which she accepted.   [T. 359].   In that position, the Plaintiff worked seven (7) days, every two weeks -- namely, four (4) days in one week, and

---

[3]The Plaintiff testified that the new group home "probably" opened in October of 1999, but she also stated that she had been at that position for four (4) years, which would have meant that she began that job in 1998, because the Hearing occurred in November of 2002.  Later, the Plaintiff testified that she began her employment with Dungarvin, in June of 1998, and that she had worked for two or three clients at her other job, both before and after she accepted the position with Dungarvin.  [T. 368-71].  The termination letter, from Health East Optional Care, was dated October 23, 2001.  [T. 118].

three (3) days in the next -- for ten (10) hours each day, from 10:00 o'clock p.m., to 8:00 o'clock a.m.   [T. 360-61].   Four female residents, who were mentally ill or mentally challenged, lived in the group home where the Plaintiff worked.  [T. 363].

During each shift, the Plaintiff was responsible for conducting an audit of a box, which contained zipper pouches where each resident stored her petty cash.  [T. 361]. Then, the Plaintiff checked the doors, in order to make sure that they were all locked, and checked on the residents, who were already in bed when she arrived and, after that, she was allowed to go to sleep.  [T. 361-62].  The Plaintiff testified that she usually slept between four and six hours each night, because one of the residents awoke around 3:00 or 4:00 o'clock a.m., and talked to herself, which kept everyone else awake, as well.  [T. 361].  In the morning, the Plaintiff set the table for the four residents.  Id.  Additionally, if one of the residents needed something during the middle of the night, it would be the Plaintiff's responsibility to handle it, but she stated that it did not happen that often, because most of the residents took psychotropic medications, and the others could be administered an additional pill, in order to help them sleep.  [T. 362].

The Plaintiff testified that another individual came into the home to cook breakfast for the residents, while the Plaintiff administered the residents' medications,

before her shift ended.  [T. 363-64].  The staff member, who cooked breakfast for the residents, helped to get them ready for their day jobs and, when they returned around 2:00 o'clock p.m., there were two staff members who stayed with them until the night shift began.  [T. 364-65].  The Plaintiff explained that she was there mainly for safety reasons.  [T. 365].  Her previous job, as a personal care attendant, was more physically demanding, in that she had to transfer her clients from their beds to their wheelchairs, bathe and dress them, and take care of them.  [T. 366].

Next, the Plaintiff's attorney questioned her.  The Plaintiff read aloud from a letter, in which she was terminated from her previous position, as follows: "[Inaudible] company does not have the specific files containing [inaudible] terminated employees who haven't worked but currently our practice is to terminate any employee between three and six months after their last assignment."  [T. 367].  The letter continued that, "[t]ypically we expect home health aids [sic] to be able to lift 100 pounds in order to be considered [inaudible]," and although "[w]e do have occasional light duty assignments available, * * * they are relatively rare."[4]  Id.  The letter was from Health East Optional Care, and was dated October 23, 2001.  [T. 118].  The Plaintiff's

---

[4]The actual letter differs slightly from what was transcribed from the Plaintiff's testimony.  [T. 118].

attorney represented that her earnings demonstrated that she continued to earn money from Health East Optional Care through 2000. [T. 58-63, 372-73]. The Plaintiff then recalled working as a companion to another lady. [T. 374].

When she applied at Dungarvin, the Plaintiff disclosed her accident, and she reported that she would not be able to perform heavy lifting, or heavy cleaning. [T. 375]. She communicated the same information to her supervisor, and she specified that she was looking for a light-duty position. [T. 375-76]. Her supervisor apparently told her that there was not much that she would be able to do, except monitor the residents, such as by preventing one of the residents, who had a tendency to run away, from leaving. [T. 376]. The Plaintiff explained that it was her job to sit close to the door, and not let the resident leave, which was why she was doing a lot of sitting, and not much work, and even though she understood that the job required her to do more, she was unable to do so. [T. 376-77]. The Plaintiff testified that her supervisor was understanding, and did not "give [her] any grief." [T. 377]. Furthermore, her supervisor had reported giving the Plaintiff special considerations, that allowed her to continue to work, by giving her fewer, and easier duties, extra help, more rest periods, less hours, and irregular hours. Id.

For example, in terms of extra help, the Plaintiff testified that there was list of people, who an employee could call, if s/he was unable to come to work.  If one of those individuals agreed to cover a shift, then the employee could leave a message on the supervisor's phone to provide notification of the change.  [T. 377-78].   The Plaintiff testified that there were two men, who would cover her shift "at the drop of a hat," and that they had worked many of her shifts for her, which occurred between one and two times per two-week pay period, for the first two years.  [T. 378-79].  After that, the Plaintiff started feeling better, and one of the ladies, "who was extra stressful," was moved to another group home.  [T. 379].

In response to questioning from her attorney, the Plaintiff testified that the regular increase in earnings, over the years subsequent to her accident, was due to raises, as well as to the fact that, in the earlier years, she had people covering her shifts more often, which meant that she did not get paid for that shift.  [T. 379].  The Plaintiff reiterated her earlier testimony, that she only counted the money, and then slept until approximately 5:00 o'clock a.m., when she arose to set the table, and start dispensing pills.  [T. 380].  In addition, there was a morning shift of staff, who came in to help, and who did the majority of the cleaning, cooking, and feeding, while the Plaintiff only did the pills.  Id.  The Plaintiff stated that she should have been doing more of the

work, but she did not, and that there were always people covering her work.  [T. 380-81].

The Plaintiff was also provided with more rest periods, because she was experiencing a lot of pain in her hip, and she was allowed to take approximately ten (10) minute breaks, whenever she needed to do so, which was usually at least three (3) times per shift.  [T. 381].  The Plaintiff testified that there were times when she arrived at work, but had to leave to go home.  [T. 382].  On one occasion, there was a resident who had a tendency to "flip[] out," and the Plaintiff requested another staff member not to leave.  Id.  According to the Plaintiff, that resident started to attack one of the other residents, which forced the Plaintiff to intervene and, during that altercation, she was injured, and she had to call her husband to come get her, and take her home.  Id.

The Plaintiff testified that she knew that she was being given special considerations because of all of the incidents, and she had been told that her employer liked the way that she performed, the way that she carried herself, and the way that she treated the residents with respect.  [T. 384-85].  In addition, the Plaintiff performed additional duties, that were not part of her shift, such as driving another staff member to work, at her employer's request.  [T. 385].  The Plaintiff further testified that she

felt that she could not perform the job, without the considerations that were made for her, because she would be fired if her employer did not have the system by which she could call another staff member, and have that person cover her shift.  Id.  In other words, absenteeism would be an issue.  Id.  After the ALJ clarified some issues as to the Plaintiff's wage statements with her attorney, the Hearing concluded.  [T. 386-88].

　　　　C.　　The ALJ's Decision.  The ALJ issued his decision on January 29, 2003. [T. 21-28].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §404.1520.[5]  However, since he

---

[5]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has

found that the Plaintiff had engaged in SGA, after her alleged disability onset date, he did not proceed to the remaining steps.  [T. 24-28].

Instead, the ALJ detailed the Plaintiff's earnings, from 1998 to 2001, and found that she had received the minimum monthly earnings required to constitute SGA.  [T. 25-26].  The ALJ considered the reports of the Plaintiff's supervisor, and found that, even though the Plaintiff received some accommodations at work, her work was "satisfactory and worth what she was paid and is considered substantial gainful activity."  [T. 27].  As a result, the ALJ concluded that the Plaintiff had not had a disabling impairment for a continuous 12-month period, and that she was not disabled. [T. 26-28].

D.    Evidence Submitted to the Appeals Council.  Subsequent to the Hearing, and the ALJ's decision, the Plaintiff submitted a letter from O'Donnell, which is dated February 12, 2003, and in which O'Donnell relates the nature of the Plaintiff's employment at Dungarvin.  [T. 338-39].  In his letter, O'Donnell notes that the Plaintiff has lifting restrictions, which she accommodates by working with her co-workers, as

_____

an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

necessary.  [T. 338].  In addition, the Plaintiff takes breaks, but she continues to be

paid during those breaks, because there are tasks, such as documentation, that she can

perform while resting.  Id.  When the Plaintiff needed to take time off, which she did

at least once per two-week pay period, she assisted in finding a replacement.  Id.

O'Donnell stated that the Plaintiff consistently used her paid time off, so that she was

unable to "bank" any of that time.  [T. 339].  As additional Exhibits, the Plaintiff

submitted a handwritten letter, as well as a doctor's order for an MRI of her left knee.

[T. 340-46].

## IV.  Discussion

A.   Standard of Review.   The Commissioner's decision must be affirmed

if it conforms to the law and is supported by substantial evidence on the Record as

a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex. rel Moore v. Barnhart, 413

F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002);

Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more

than a mere search for the existence of evidence supporting the Commissioner's

decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal

Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of

the evidence must take into account whatever fairly detracts from its weight, see,

Moore ex. rel Moore v. Barnhart, supra at 721;  Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998), and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).   On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether or not substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n. 6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."  Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm

the denial of benefits.'" Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005),

quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v.

Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259,

262 (8th Cir. 1996). Under this standard, we do not reverse the Commissioner even

if this Court, sitting as the finder-of-fact, would have reached a contrary result. See,

Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210,

1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of

drawing two inconsistent conclusions and, therefore, it embodies a "zone of choice,"

within which the Commissioner may decide to grant or deny benefits without being

subject to reversal on appeal. See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir.

1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as

there is substantial evidence in the record to support the Commissioner's decision, we

will not reverse it simply because substantial evidence exists in the record that would

have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.

1995), or 'because we would have decided the case differently.'"), quoting Holley v.

Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001). Our review of the ALJ's factual

determinations, therefore, is deferential, and we neither reweigh the evidence, nor

review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

Where, as here, new evidence has been submitted to the Appeals Council, which the Council has examined in declining to review the ALJ's determination, our task is not fundamentally different, although the Record we review is expanded to incorporate the new evidence.  On such occasions, the Appeals Council is to treat the new evidence as though it were a part of the Record before the ALJ, and "then review the case if it finds that the administrative law judge's action, findings, or conclusion [were] contrary to the weight of the evidence," which now includes the new evidence. Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992); Brosnahan v. Barnhart, 336 F.3d 671, 675-76 (8th Cir. 2003), citing Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).  Should the Appeals Council decline to review the case further, the reviewing Court's role is to "review the ALJ's decision and determine whether there [was] substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision."  Id., quoting Browning v. Sullivan, 958 F.2d 817, 823 n.4 (8th Cir. 1992); see also, Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994)(noting that the standard creates "a peculiar task for a reviewing court," because

it asks the Court to decide how the ALJ would have decided the matter had this additional evidence been before him or her).

Thus, we are obliged to review all of the evidence, even the evidence that had never been considered by the ALJ, in order to determine whether the ALJ's decision was supported by substantial evidence in the Record as a whole.  In such instances, the Court must "not evaluate the Appeals Council's decision to deny review, but rather * * * determine whether the record as a whole, including the new evidence, supports the ALJ's determination."  Cunningham v. Apfel, supra at 500.

B.   Legal Analysis.  The Plaintiff did not work from the time of her accident on February 8, 1998, until June of 1998, when she resumed her employment at Health East Optional Care.  She was subsequently terminated from that position, and shortly thereafter, obtained employment at Dungarvin.  Based on the duties of those positions, and the income earned, the ALJ found that the Plaintiff was not disabled, as she had not established her inability to engage in SGA for any twelve (12) month period.  See, Title 42 U.S.C. §423(d)(1)(A) (defining "disability" as the "inability to engage in any substantial gainful activity * * *which has lasted or can be expected to last for a continuous period of not less than 12 months.").  We now review that decision to determine whether it is supported by substantial evidence.

"Substantial gainful activity is work activity that is both substantial and gainful," see Comstock v. Chater, 91 F.3d 1143, 1145 (8th Cir. 1996), and requires that the work activity "involve[] doing significant physical or mental activities," and be "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §416.972; see 20 C.F.R. §416.10, see also, Reeder v. Apfel, 214 F.3d 984, 989 (8th Cir. 2000). A claimant generally performs SGA when her "duties require use of [her] experience, skills, supervision and responsibilities, or contribute substantially to the operation of a business." See 20 C.F.R. §416.973(a).

SGA may also include work under special conditions. 20 C.F.R. 416.973(c). Such conditions include, but are not necessarily limited to: 1) receiving special assistance from other employees in the performance of job duties; 2) being allowed to "work irregular hours or take frequent breaks," 3) being provided with special equipment or assigned special duties; 4) receiving assistance in preparing for or getting to and from work; 5) being permitted to work at a lower standard of productivity than other employees; 6) receiving "the opportunity to work, despite * * * impairments, because of family relationship, past association with [an] employer, or [an] employer's concern for [the claimant's] welfare." 20 C.F.R. 416.973(c)(1) through (c)(6). However, SGA will not be found if a claimant is unable "to do ordinary or simple

tasks without more supervision or assistance than is usually given other people doing similar work," or if the work involves "minimal duties that make little or no demands on [the claimant] and that are of little or no use to [an] employer."   20 C.F.R. 416.973(b).

The Department of Health and Human Services has created a presumption that earnings over a certain amount constitute SGA.  See 20 C.F.R. 404.1574(b)(2).   As is pertinent to the present case, SGA is to be presumed if the Plaintiff's average earnings for the time period between June of  1998 and June of 1999 are above $500.00 per month; the Plaintiff's average monthly earnings for the period between July of 1999 and December of 2000 exceed $700.00; and the Plaintiff's average monthly earnings for the 2001 calender year exceeded $700.00, plus a modest increase to reflect trends in national wage growth.  See 20 C.F.R. §1574(b)(2).  However, this presumption is rebuttable, Thompson v. Sullivan, 928 F.2d 276, 277 (8th Cir. 1991), and may be rebutted if "a claimant's job is maintained only through extensive assistance or employer charity."  See Fisher v. Barnhart, 129 Fed.Appx. 297, 302 (7th Cir., February 11, 2005), citing Jones v. Shalala, 21 F.3d 191, 192-193 (7th Cir. 1994).

The ALJ found that the presumption of SGA was applicable, since that the Plaintiff's average monthly earnings exceeded the requisite amounts for each of the

pertinent time periods.  The bases for the ALJ's conclusion were the summaries of quarterly earnings, for each of the two employment positions that the Plaintiff has held since the onset of her disability, as well as the summary of the Plaintiff's earnings for each of the years in question.  [T. 56-64].  Those summaries, along with the Plaintiff's testimony, in which she agreed with the ALJ's recitation of her earnings, support the ALJ's conclusions that the Plaintiff's average monthly income exceeded those amounts that are identified in the Code of Federal Regulations.  Accordingly, the ALJ's application of the presumption of SGA was supported by substantial evidence.

The ALJ also rejected the Plaintiff's contention that, despite her earnings, the accommodations provided by her employer excluded her employment from being considered SGA.  The Record reflects that such accommodations included fewer and easier duties, extra help with certain tasks, more rest periods, less hours, and irregular hours.  [T. 129].  Specifically, the Plaintiff is excused from heavy lifting, such as carrying laundry, or helping the residents bathe, and she is allowed to take frequent breaks.  The Plaintiff also misses shifts on certain occasions, due to soreness, but helps to insure that her shifts are covered by other employees.

Despite these accommodations, the Plaintiff performs a number of duties in her position.  Specifically,  the Plaintiff works three (3) or four (4) shifts per week, for a

total of seven (7) shifts during every two-week period.  On a typical shift, the Plaintiff arrives at 10:00 o'clock p.m., and begins her shift by performing an audit on the petty cash box.  She then conducts a check on the residents of the facilities, in order to insure that they are asleep in their rooms, and checks to see that all of the doors are locked.  [T. 361].  She is then allowed to go to sleep.  During the occasional event, when a resident wakes up during the night, the Plaintiff is required to attend to the resident's needs.  The Plaintiff wakes up at approximately 5:30 o'clock a.m., and sets the table for breakfast.  Another staff person arrives, for the day shift, at approximately 6:00 o'clock a.m., and helps to prepare the breakfast for the residents.  During that time, the Plaintiff distributes medications to the residents and completes the accompanying paperwork.  [T. 361-364].  The Plaintiff typically works a ten (10) hour shift, which ends at 8:00 o'clock a.m.

Based on those job duties, O'Donnell, who is the Plaintiff's supervisor at Dungarvin, described the Plaintiff's work as being fully worth the amount paid, and noted that, while the Plaintiff was limited in her duties, "she [wa]s expected to pick up more of the tasks that she [wa]s capable of doing so that she [wa]s a productive member of the team."  [T. 128-130].  Given this evidence, we conclude that the ALJ's determination, that the Plaintiff was performing SGA, notwithstanding the

accommodations that she received from her employer, is supported by substantial evidence on the Record that was before him.  See, <u>Cooper v. Secretary of Health and Human Services</u>, 919 F.2d 1317, 1320 (8th Cir. 1990)(church janitor who had to rest often, and was not productive on certain days, but who had specific duties to be completed, and was subject to reprimand, was engaged in SGA); <u>Martinez v. Commissioner of Social Security</u>, 132 Fed.Appx. 310, 313 (11th Cir., May 24, 2005) (library acquisition clerk, who was accommodated with reduced hours, weekend hours, and assistance with physical tasks, but who properly performed the other duties of the position, was engaged in SGA); <u>Skafica v. Secretary of Health and Human Services</u>, 1990 WL 177202 at *2 (6th Cir., November 14, 1990)(dishwasher whose limitations were accommodated by being permitted to only washing pots and pans was engaged in SGA).

The ALJ's decision is also supported by the new evidence that was submitted to the Appeals Council, which included a letter from O'Donnell that further explained some of the Plaintiff's work performance, along with an exhibit, which was prepared by the Plaintiff, and in which she described her ability to function at her job.  [T. 338-343].  Notably, O'Donnell's letter reiterated the Plaintiff's duties, and reported that she was responsible for reviewing the staff communication logs, health care notes, and

financial audits of the petty cash.  [T. 338].  He also related that the Plaintiff "teams with the morning staff to complete tasks such as preparing breakfast, passing medications, helping with the consumer's personal needs, helping people get dressed, and doing some light cleaning."  [T. 38].  O'Donnell noted that the Plaintiff's duties were affected by her lifting restrictions, as well as her need to take more frequent breaks, for which she was paid, but he advised that she was able to work with her co-employees to accomplish the necessary tasks.  O'Donnell's letter further reflects that, on average, the Plaintiff has taken at least one night off during every two-week pay period.  Like other employees, the Plaintiff receives 4.62 hours of paid leave time for every pay period, but she has needed to use her paid leave consistently enough that she has been unable to accumulate any significant amount of leave time.

The Plaintiff's description of her duties also supports the ALJ's findings, as she reveals that she does perform useful services for her employer.  Specifically, the Plaintiff has described how her morning duties include setting the table,  preparing the medications, making the bed for one of the facilities' four residents, administering medications, and placing the residents' lunch bags by the door.  [T. 341].  Such duties certainly assist in the functioning of the facilities, even if the Plaintiff does not actually prepare breakfast, or help to dress and bathe the residents.

- 30 -

In short, after considering this new evidence, in conjunction with the evidence presented to the ALJ, we are satisfied that the ALJ's conclusion, that the Plaintiff is not entitled to disability benefits because of her engagement in SGA, is supported by substantial evidence on the Record as a whole. Accordingly, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion for Summary Judgment be denied.

NOW, THEREFORE, It is –

RECOMMENDED:

1.     That the Plaintiff's Motion [Docket No. 16] for Summary Judgment be denied.

2.     That the Defendant's Motion [Docket No. 17] for Summary Judgment be granted.

Dated: August 16, 2005         s/Raymond L. Erickson

                               Raymond L. Erickson
                               UNITED STATES MAGISTRATE JUDGE

**NOTICE**

- 31 -

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than September 2, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than September 2, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.